IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

CARLA OAKLEY,

    Plaintiff,

v.                                    CIVIL ACTION NO. 1:21-00021

COAST PROFESSIONAL, INC.,
PERFORMANT FINANCIAL CORP.,
and PERFORMANT RECOVERY, INC.

    Defendants.

## MEMORANDUM OPINION

On September 30, 2021, the court entered an order (1) granting without prejudice the motion to dismiss of defendant Performant Financial Corp. ("PFC") for lack of personal jurisdiction (ECF No. 9); (2) denying the motion to dismiss of defendants PFC and Performant Recovery, Inc. ("PRI") (ECF No. 11); and (3) denying the motion to dismiss of defendant Coast Professional, Inc. ("Coast") (ECF No. 13).  (ECF No. 52.)  In this Memorandum Opinion, the court sets forth its reasoning for denying PFC and PRI's motion to dismiss (ECF No. 11) and Coast's motion to dismiss (ECF No. 13).

## I.   Background

This is a putative class action alleging deceptive debt collection practices by defendants in violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA").

Plaintiff says defendants violated the WVCCPA when they sent her a letter regarding her defaulted student loan.  She says that the letter was deceptive and misleading under the WVCCPA because it represented that the collection agency's contingency fee was due and owing as part of the "current balance" even though the agency had not yet earned the contingency fee by collecting the debt.  The contingency fee was listed in the category "FEES & COSTS" and was computed assuming that there would be a full recovery of the principal and interest then due on the defaulted loan.  There was a false implication, says plaintiff, that the contingency fee (in the amount listed) was "unavoidable" and "fixed."  (See, e.g., First Am. Compl. ¶ 66.)

Plaintiff says that defendants compounded the deception by using language in the body of the letter that attached the U.S. Department of Education's ("ED") imprimatur to the amount due, and further, by attempting to qualify the "FEES & COSTS" with an asterisk and cryptic note (on the back of the letter) suggesting that the amount listed may not be due presently after all, and may change.  Plaintiff also points to language on the front page of the letter stating that the amount ultimately due may be greater than the current balance but failing to acknowledge that the amount due may be less (because the contingency fee is ultimately less).

Plaintiff has named three defendants in her First Amended Complaint ("FAC"):  Coast, PFC, and PRI.  Coast allegedly contracted with the ED to collect the debt and then subcontracted with PRI, which is a wholly owned subsidiary of PFC.  PRI sent the collection letter at issue.  The letter states that PRI sent it while acting on behalf of Coast. Although PFC is not mentioned in the letter, plaintiff alleges that PFC and PRI sent the letter jointly.  Moreover, plaintiff alleges that PFC operates as a single business with a single management team that reports to its CEO.

## II.  Legal Standard

"The purpose of a Rule 12(b)(6) motion is to test the [legal] sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Edwards v. City of Goldsboro, 178 F.3d 231, 243–44 (4th Cir. 1999) (citations and internal quotation marks omitted).  A Rule 12(b)(6) defense asserts that even if all the factual allegations in a complaint are true, they remain insufficient to establish a cause of action.  This court is also mindful that "[w]hether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish

that ground, not on the nature of the ground in the abstract."
Jones v. Bock, 549 U.S. 199, 215 (2007).

Accordingly, Federal Rule of Civil Procedure 8(a)(2)
requires that "a pleading . . . contain a 'short and plain
statement of the claim showing that the pleader is entitled to
relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 677—78 (2009)
(citing Fed. R. Civ. P. 8(a)(2)).  The purpose of Rule 8(a)(2)
is to ensure that "the defendant [receives] fair notice of what
the . . . claim is and the grounds upon which it rests." Conley
v. Gibson, 355 U.S. 41, 47 (1957).  A plaintiff must allege
"enough facts to state a claim to relief that is plausible on
its face" and "raise a right to relief above the speculative
level." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599,
615 n.26 (4th Cir. 2009).

The United States Supreme Court has maintained that
"[w]hile a complaint . . . does not need detailed factual
allegations, . . . a plaintiff's obligation to provide the
grounds of his entitle[ment] to relief requires more than labels
and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Bell Atl. Corp. v. Twombly, 550
U.S. 544, 555 550 (2007) (citations and internal quotation marks
omitted).  The court need not "accept as true unwarranted
inferences, unreasonable conclusions, or arguments." E. Shore
Mkts., Inc. v. J.D. Assocs. Ltd P'ship, 213 F.3d 175, 180 (4th

4

Cir. 2000).  Courts must also take care to avoid confusing the
veracity or even accuracy underlying the allegations that a
plaintiff has leveled against a defendant with the allegations'
likelihood of success.  While "the pleading must contain
something more . . . than . . . a statement of facts that merely
creates a suspicion [of] a legally cognizable right of action,"
5 C. Wright & A. Miller, Federal Practice and Procedure § 1216
(3d ed. 2004), "assum[ing]" of course "that all the allegations
in the complaint are true (even if doubtful in fact)," Twombly,
550 U.S. at 555, it is also the case that "Rule 12(b)(6) does
not countenance . . . dismissals based on a judge's disbelief of
a complaint's factual allegations." Neitzke v. Williams, 490
U.S. 319, 327 (1989).  Therefore, courts must allow a well-
pleaded complaint to proceed even if it is obvious "that a
recovery is very remote and unlikely." Scheuer v. Rhodes, 416
U.S. 232, 236 (1974).

## III. Discussion

Defendants jointly make three arguments in support of
dismissal:  (1) plaintiff did not comply with the WVCCPA's
right-to-cure notice requirement; (2) federal law preempts
plaintiff's claims; and (3) the collection letter at issue is
not deceptive or misleading within the meaning of the WVCCPA.
The first argument is unavailing because the statutory language
contemplates sending the right-to-cure notice after a case is

filed, and plaintiff did so long ago.  The second argument fails because the allegations do not limit this case to a nondisclosure case and because the claims here obstruct no important federal interest in the manner required to invoke obstacle preemption successfully.  Finally, because the third argument presents a close call that is best suited for determination after further development of the record, it does not prevail at the pleading stage.

Coast separately argues that it must be dismissed because it did not send the letter at issue and because plaintiff does not sufficiently allege an agency relationship between Coast and the sender, PRI.  The court disagrees with this argument.  Plaintiff quotes a portion of the letter in the FAC which states that Coast had authorized PRI to act on Coast's behalf.  Although PRI qualifies this statement with "as a subcontractor," plaintiff is entitled to the benefit of a reasonable inference at this stage that there was an agency relationship.  Coast may seek to establish with a summary judgment motion that PRI was acting as a mere independent contractor.

**a. Right to Cure**

The WVCCPA contains a right-to-cure provision, the operative version of which[1] reads in pertinent part as follows:

---

[1] The provision was amended effective June 16, 2021.

> No action may be brought pursuant to this article
> . . . until the consumer has informed the creditor or
> debt collector in writing and by certified mail,
> return receipt requested . . . of the alleged
> violation and the factual basis for the violation and
> provide the creditor or debt collector forty-five days
> from receipt . . . of the notice of violation <u>but
> twenty days in the case a cause of action has already
> been filed</u> to make a cure offer . . . .

W. Va. Code § 46A-5-108(a) (2017).

Plaintiff sent the required notice to PRI prior to filing her original complaint in state court.  However, at the time plaintiff filed her FAC, adding Coast and PFC, on November 24, 2020, she had not provided additional notices to these new defendants.  She provided such notices on February 5, 2021 (after Coast's removal of the case to this court and the same day defendants filed their motions to dismiss).

Plaintiff argues that there is no deficiency now that she has sent the right-to-cure notices and the requisite time has elapsed.  She asserts that the statutory provision contemplates the sending of such notices when "a cause of action has already been filed."  She further contends that the defendants are all closely related; thus, notice to one was effectively notice to all.  Finally, plaintiff contends that in these circumstances, the appropriate remedy for any non-compliance the court may find is leave to amend.

The right-to-cure notice requirement is non-jurisdictional.  <u>Adkins v. Midland Credit Mgmt., Inc.</u>, No. 5:17-CV-04107, 2019 WL

7

1370872, at *3 (S.D.W. Va. Mar. 26, 2019).  The statutory language sends mixed messages about whether post-filing compliance is appropriate.  On one hand, it says that "[n]o action may be brought" until the notice is sent.  On the other, it suggests that notices may be sent when "a cause of action has already been filed."  It is plausible that this provision contemplates situations such as this one, where the plaintiff does not realize that additional defendants should be added until after filing her original complaint.

If the purposes of the right-to-cure provision are to provide defendants with notice and an opportunity to minimize litigation costs and their potential exposure, it appears that those purposes were substantially achieved here.  Defendants do not argue that any deficiency in the notices deprived them of notice or a meaningful opportunity to make a cure offer.  In light of defendants' interrelatedness, plaintiff's substantial compliance with § 46A-5-108(a), and the language of § 46A-5-108(a) suggesting that post-filing right-to-cure notices are at least sometimes permissible, the court finds that dismissal is an inappropriate outcome here.[2]

_____

[2] In any event, the court would be inclined to grant leave to amend.

**b. Preemption**

The Constitution's Supremacy Clause requires state law to yield to federal law (including the Constitution itself) in the event of a conflict.  See U.S. Const. art. VI, cl. 2.; Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008); Coll. Loan Corp. v. SLM Corp., 396 F.3d 588, 595 (4th Cir. 2005).  The "taxonomy of preemption yields four fundamental varieties:  express preemption, field preemption, impossibility preemption, and obstacle preemption."  Gregory M. Dickinson, Calibrating Chevron for Preemption, 63 Admin. L. Rev. 667, 672 (2011).

At issue here are express preemption and obstacle preemption.  Express preemption applies "when Congress expressly so provides."  Duvall v. Bristol-Myers-Squibb Co., 103 F.3d 324, 328 (4th Cir. 1996).  With this kind of preemption, "Congress announces its intent to invalidate state law through 'an express preemption provision' explicit in the federal statute itself." Student Loan Servicing All. v. District of Columbia, 351 F. Supp. 3d 26, 51 (D.D.C. 2018) (quoting Arizona v. United States, 567 U.S. 387, 399 (2012)).  Congress's intention must be clear. Coll. Loan, 396 F.3d at 595–96.  "Express preemption doctrine therefore involves the difficult but familiar judicial task of determining the intended preemptive reach of statutory language."  Dickinson, 63 Admin. L. Rev. at 671.

Obstacle preemption is one of the two forms of conflict preemption (the other being impossibility preemption). Coll. Loan, 396 F.3d at 596.  With this kind of preemption, state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Columbia Venture, LLC v. Dewberry & Davis, LLC, 604 F.3d 824, 829–30 (4th Cir. 2010).  The party asserting obstacle preemption must make "an essential threshold showing" that the federal goal at stake is "significant." Smith v. BAC Home Loans Servicing, LP, 769 F. Supp. 2d 1033, 1039 (S.D.W. Va. 2011); see also Coll. Loan, 396 F.3d at 597 (implying that federal goal must be "important").

"What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." PPL EnergyPlus, LLC v. Nazarian, 753 F.3d 467, 478 (4th Cir. 2014), aff'd sub nom. Hughes v. Talen Energy Mktg., LLC, 578 U.S. 150 (2016).  In deciding whether conflict preemption applies, courts must "independently . . . consider national interests and their putative conflict with state interests." Columbia Venture, 604 F.3d at 830.  Quite unlike the express preemption analysis, the obstacle preemption analysis "is more an exercise of policy choices by a court than strict statutory construction." See id.[3]

---

[3] Justice Thomas has called into question the policy-driven nature of the obstacle preemption analysis, aloof from the text

Courts are admonished not to "seek out conflicts between state
and federal regulation where none clearly exists." Coll. Loan,
396 F.3d at 598.

Instead, in weighing whether state law is preempted, courts
are to seek out Congressional intent and presume that Congress
generally intends to leave state law intact. See Wyeth v.
Levine, 555 U.S. 555, 565, 565 n.3 (2009).  "The presumption
applies with particular force when the state is exercising its
police power." Pennsylvania v. Navient Corp., 967 F.3d 273, 288
(3d Cir. 2020).  Of course, the presumption against preemption
is rebuttable and yields in the face of a "clear and manifest"
Congressional purpose to preempt state law.  Id.  Notably, there
is also a presumption that Congress intends preemption doctrine
to resolve impossibility and obstacle conflicts.  See Wyeth, 555
U.S. at 565 (Supreme Court has "assumed that Congress would not
want either kind of conflict").  When there is a true conflict,

---

as it sometimes is.  See Kansas v. Garcia, 140 S. Ct. 791, 808
(2020) (Thomas, J., concurring) (noting that obstacle preemption
doctrine "rests on judicial guesswork"); Wyeth, 555 U.S. at 587-
88 (Thomas, J., concurring) ("This Court's entire body of
'purposes and objectives' pre-emption jurisprudence is
inherently flawed.  The cases improperly rely on legislative
history, broad atextual notions of congressional purpose, and
even congressional inaction in order to pre-empt state law.").
The court is of course bound to follow the obstacle preemption
jurisprudence of the Supreme Court and the Fourth Circuit Court
of Appeals as it presently stands.  The court notes Justice
Thomas's criticism merely for its value in elucidating the
nature of the obstacle preemption analysis.

Congressional intent to displace state law is "inferred."  See
Abbot by Abbot v. Am. Cyanamid Co., 844 F.2d 1108, 1116 (4th
Cir. 1988) (Wilkins, J., concurring).

Neither express nor obstacle preemption applies to defeat
the claims here.  For express preemption to apply, the court
would need to conceptualize plaintiff's misrepresentation claims
as mere nondisclosure claims in disguise.  There may be a fine
line between the misrepresentation claims that plaintiff asserts
and nondisclosure claims, but at the pleading stage, it appears
that plaintiff's claim is on the permissible side of the line.
Obstacle preemption does not apply because plaintiff's claims
thwart no important federal interest.  For obstacle preemption
to apply, the federal interest generally must be clear and
specific, and the conflict must be sharp enough to infer a
Congressional intent to displace state law.  Such is not the
case here.

## 1. Express Preemption

The basic question is whether 20 U.S.C. § 1098g preempts
the claims here.  That section provides, "Loans made, insured,
or guaranteed pursuant to a program authorized by title IV of
the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.) shall
not be subject to any disclosure requirements of any State law."
20 U.S.C. § 1098g (emphasis added).  This language unambiguously
"preempts state laws requiring federal student loan servicers to

make additional disclosures beyond what the [Higher Education Act] requires." Lawson-Ross v. Great Lakes Higher Educ. Corp., 955 F.3d 908, 916 (11th Cir. 2020). That much is uncontroverted. The rub is whether the claims of deception here are, at their core, mere nondisclosure claims. If so, express preemption applies.

Federal appellate courts in other circuits, plodding similar ground, have helped draw boundaries between preempted and non-preempted misrepresentation-based claims. In Chae v. SLM Corp., the Ninth Circuit Court of Appeals held that certain claims styled as misrepresentation claims were really nondisclosure claims, and thus, were preempted. 593 F.3d 936, 942 (9th Cir. 2010). The preempted claims included those alleging the use of "billing statements and coupon books that trick[ed] borrowers into thinking that interest [was] being calculated via the installment method" instead of "a simple daily calculation." Id. at 942. The court concluded that "[a]t bottom, the plaintiff's misrepresentation claims [were] improper-disclosure claims." Id. The court conceptualized the plaintiffs' claims under a California consumer protection statute as an indirect method of regulating disclosures: "[T]he state-law prohibition on misrepresenting a business practice 'is merely the converse' of a state-law requirement that alternate disclosures be made." Id. at 943 (quoting Cipollone v. Liggett

13

Group, Inc., 505 U.S. 504, 527 (1992)).  A broad reading of Chae would suggest that the court there took an expansive view of what counts as a mere nondisclosure claim for purposes of § 1098g preemption.

The Third, Seventh, and Eleventh Circuit Courts of Appeals have distinguished Chae and allowed similar claims to proceed that, in those courts' estimation, were on the non-preempted side of the line.  See Navient, 967 F.3d at 290; Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 642 (7th Cir. 2019); Lawson-Ross, 955 F.3d at 919.[4]

The plaintiff in Nelson alleged that the defendant wrongfully steered her and others similarly situated toward loan forbearance instead of income-driven repayment plans.  928 F.3d at 644.  The Seventh Circuit perceived Nelson's complaint as alleging a mixture of "affirmative misrepresentations . . . such as recommending forbearance as the best option for a particular borrower, and failures to disclose information."  Id. at 645. "[T]he difference between affirmative misrepresentation and failure to disclose information" was the decisive factor to the court.  Id. at 644.

---

[4] The court will discuss these appellate decisions in the order in which they were decided:  Nelson, Lawson-Ross, Navient.

In reversing the district court, which had granted dismissal on preemption grounds, the Seventh Circuit stated as follows:

> When a plaintiff alleges a defendant's actionable failure to disclose, it is easy to understand how that claim implies a "disclosure requirement," to use the language of § 1098g.  But when a plaintiff alleges a defendant's false affirmative misrepresentation, recasting the claim as imposing a "disclosure requirement" is not necessary and may not even be appropriate.  If the claim is that the defendant said something false that it was not required to say in the first place, the claim does not necessarily imply a disclosure requirement.  The defendant could have complied with its legal obligations, under the plaintiff's theory, by merely refraining from making the false affirmative misrepresentation about its expertise, its work in borrowers' best interests, and its recommendation of forbearance to most distressed borrowers.
>
> In this case, the district court relied upon a broad reading of the Ninth Circuit's opinion in Chae v. SLM Corp., 593 F.3d 936 (9th Cir. 2010), to treat Nelson's complaints about affirmative misrepresentations as implying some additional disclosure requirements.  While Chae may apply to some of Nelson's claims, it was a mistake to read Chae so broadly.  The plaintiffs in Chae complained about the supposed failures to disclose key information in specific ways, such as loan terms and repayment requirements.  Since the defendant was required to disclose that information by federal law and had disclosed it in ways permitted by federal law, the Ninth Circuit found that the plaintiffs were implicitly seeking to impose additional disclosure requirements under state law.  We do not disagree with the Ninth Circuit's reasoning, but Chae itself made clear that § 1098g would not extend to other sorts of disclosures to borrowers.  Chae limited the reach of some of its broader language by holding that other state-law claims, focusing on the "use of fraudulent and deceptive practices *apart from the billing statements*," are not preempted by § 1098g. 593 F.3d at 943 (emphasis added).

Id. at 649-50.

In seeking out the scope of "disclosure requirements" under § 1098g (and thus, the scope of preemption), the court considered the typical function of disclosures:

> In general, disclosure requirements are familiar regulatory tools applied to consumer borrowing and other financial transactions. Rather than regulating the substance of the transaction terms (such as usury laws do by limiting interest rates), disclosure requirements are intended to ensure that consumer-borrowers have accurate, relevant information and can make their own informed choices about their financial affairs.

Id. at 647. Because § 1098g offers "no specific guidance about the scope of 'disclosure requirements,'" the court looked to § 1083, which mandates certain disclosures, as a "backdrop." Id. at 647–48.

The court rejected the district court's "broad reading" of Chae, saying it was "a mistake" to apply Chae to all of the claims at issue. Id. at 649-50. It limited Chae to situations where defendants make disclosures that are mandatory under federal law and do so in a manner that conforms with federal law, but then a claim under state law seeks to hold that disclosure deficient. Id. at 649-50. By contrast, when a defendant had no mandate to communicate the allegedly false information, and when the plaintiff's claim does not depend upon

16

"proof that [the] defendant failed to disclose information," the claim can proceed.  Id. at 650.

Lawson-Ross featured claims under Florida law that a student loan servicer "made affirmative misrepresentations to [the plaintiffs] and other borrowers that they were on track to have their student loans forgiven based on their public-service employment when, in fact, their loans were ineligible for the forgiveness program."  955 F.3d at 911.  The express preemption argument, once again, was that the "claims were based on alleged failures to disclose information" and that allowing the claims to proceed "would effectively impose additional disclosure requirements, in violation of § 1098g."  Id. at 914.  The defendants argued, in other words, that plaintiffs' "affirmative misrepresentation claims, at their core, [were] based on a failure to disclose correct information."  Id. at 916.  The Eleventh Circuit rejected this argument.

The court's opinion drew a distinction between (1) claims regarding how loan servicers disclose information that federal law requires them to disclose; and (2) claims regarding "voluntarily provided information on a matter on which [the servicer] was not required to disclose."  Id. at 919.  The court understood Chae as prohibiting only the former kind of claim, that is, one where a servicer makes a mandatory disclosure in compliance with federal law but then faces a claim under state

17

law that it should have made the disclosure differently.  Id.[5]
Because the plaintiffs "made no claim that [the defendant]
disclosed in a misleading manner information it was required to
disclose," but instead claimed that the defendant "voluntarily
provided [false] information on a matter on which it was not
required to disclose," the court was not persuaded that Chae was
on point.  Id. at 919.

Finally, the Navient court stated that it would follow its
sister circuits (including the Ninth Circuit in Chae) and "adopt
the distinction between affirmative misrepresentation and
failure to disclosure information as required by the Education
Act."  967 F.3d at 290.  It held that "[s]ection 1098g does not
expressly preempt claims to the extent they are alleging
affirmative misrepresentations rather than failures of
disclosure."  Id.

The plaintiff in Navient alleged that the defendant had
falsely stated that forbearance was the only loan-assistance
option, had provided false information about loan forgiveness,
enrolled a debtor in forbearance wrongfully, promised and then
failed to provide information about Income-Driven Repayment
(IDR) plans, and promised and then failed to send an annual

---

[5] It is unclear under the Lawson-Ross court's analysis whether
omission-based misrepresentation claims avoid preemption when
the duty to speak derives not from the HEA but from a duty under
state law not to make a material, fraudulent omission.

renewal reminder.  Id. at 290-91.  The court drew a line between misrepresentation and lack of disclosure, stating, "To the extent these allegations hold Navient accountable for its affirmative misconduct, they are not preempted.  The Commonwealth cannot fault Navient for failing to provide consumers with more information about IDR plans or recertification, but it can fault Navient for providing misinformation."  Id. at 291 (emphasis added).[6]

    Thus, the Seventh and Eleventh Circuits distinguished the allegations before them from those in Chae by focusing heavily on the voluntary nature of the alleged misrepresentations.  These courts read Chae narrowly, but they appeared to accept that § 1098g sometimes preempts "misrepresentation" claims as indirectly seeking to regulate disclosure requirements.  The Third Circuit (with the most recent opinion) took a somewhat different tack.  It accepted Chae's determination that

---

[6] The court raised but declined to resolve at the appellate level the issue of whether § 1098g preempts "material" omissions, such as would constitute fraud by intentional non-disclosure. Navient, 967 F.3d at 292 n.12.  Under West Virginia common law, "[f]raud is the concealment of the truth just as much as it is the utterance of a falsehood."  Smith v. First Cmty. Bancshares, Inc., 575 S.E.2d 419, 432 (W. Va. 2002).  As in Navient, the parties have not fully briefed this precise preemption issue. The court will assume at present that, even if plaintiff's claims are omission-based, the omissions are material, and fraudulent omissions are not preempted under § 1098g as mere nondisclosures.  Defendants are free to argue otherwise on summary judgment.

misrepresentation claims are sometimes impermissible
nondisclosure claims by a different name.  Its ultimate
distinction, however, was between allegations of a lack of
information (preempted) and allegations of "misinformation" (not
preempted).  Navient also noted the voluntary nature of the
alleged misrepresentation, but to a lesser degree.  See id. at
290 ("To the extent the [plaintiff] faults [the defendant] for
failing to disclose or notify borrowers of certain information,
it does so only because [the defendant's] failure to disclose
certain information furthered the affirmative misrepresentations
[the defendant] voluntarily chose to make.").  The defendant
argued that some of the "alleged misstatements" were required by
federal law, but the court disagreed because the defendant did
"not actually cite to any provision of law that would have
required" it to use the language at issue.  See id. at 291.

     Here, defendants' express preemption argument carries some
weight when analyzed in light of these persuasive authorities.
The court rejects an overly broad reading of Chae that would
perceive of every fraud claim as a nondisclosure claim for
preemption purposes.  But the Courts of Appeals that have
distinguished Chae have not done so on bases that clearly
distinguish this case.  Under the voluntary/mandatory
distinction employed in the Seventh and Eleventh Circuits, the
claims here may not survive because the "current balance" was a

mandatory disclosure.  <u>See</u> 20 U.S.C. § 1083.  It is more likely that the claims would survive in the Third Circuit, which did not draw as bright of a line between voluntary and mandatory disclosures, but instead, between "more information" and "misinformation."  <u>See</u> <u>Navient</u>, 967 F.3d at 291.  Even in the Third Circuit, though, if the disclosure is specifically prescribed by federal law, it is preempted even if inaccurate.

At the pleading stage, plaintiff's claims pass muster because it remains unclear whether federal law prescribed the alleged misrepresentations.  Defendants cite a procedures manual suggesting that the contingency fee should be included in the current balance figure.  Plaintiff disputes whether the manual sets forth mandatory procedures and contends that defendants take the manual's language out of context.  The court notes that immediately before the procedures manual suggests that collection costs are to be included, it says, "<u>If the</u> Collection Costs are included, are they within 18.5% of the total principal and interest?" (ECF No. 32-1, at 7 (emphasis added).)[7]

It is also not clear whether the manual sets forth mandatory procedures.  Federal regulations carrying the force of law may preempt state law.  <u>Wyeth v. Levine</u>, 555 U.S. 555, 576–

---

[7] Full text of the procedures manual available at
https://www.governmentattic.org/33docs/EDpcaManual_2016.pdf.

77.  But standing alone, a guidance document does not carry the force of law and is not entitled to deference beyond its power to persuade.  See Perez v. Cissna, 914 F.3d 846, 860 (4th Cir. 2019) (King, J., dissenting), rev'd en banc sub nom. Perez v. Cuccinelli, 949 F.3d 865 (4th Cir. 2020).  Nevertheless, a guidance document "might help explain how state law affects a regulatory scheme."  Koch & Muphy, Admin. L. & Prac. § 4:24 (3d ed.) (2021).[8]

It is likewise unclear at the pleading stage whether defendants had the scienter to defraud by omission, which may be another way of distinguishing non-preempted misrepresentation claims from preempted nondisclosure claims.  The court will await the clarity of a more developed record.  For now, the

---

[8] Commentators suggest that even though guidance documents do not carry the force of law, to the extent they impose mandatory requirements on regulated parties, they present a "fairness" issue that may guide the preemption analysis:

Still the public may be stuck in the middle.  Thus, where the public is placed in a dilemma between compliance with state law and the compulsions of a guidance documents [sic], fairness should determine the extent to which a federal guidance document preempts state law.  The balance may shift in the direction of preemption where conformity to the guidance document is necessary to the national program.

Id.  Whether a "fairness" factor is appropriate for preemption is unclear, but this consideration may speak to the equities of this case in general, should it turn out that defendants were following or attempting to follow the requirements of a guidance document.

court makes the <u>preliminary</u> conclusion at the pleading stage
that the claims are not preempted.  See <u>Nelson</u>, 928 F.3d at 650
("We cannot say on the pleadings that all of Nelson's claims are
preempted by § 1098g.  On remand, the district court may need to
use jury instructions and other tools to allow Nelson to proceed
on her claims of affirmative misrepresentations while ensuring
that the case does not become a vehicle for state law to impose
new disclosure requirements.").

**2. Obstacle Preemption**

Defendants also seek to apply <u>Chae</u>'s broad conflict-
preemption holding to this case.  The court there held that the
state-law claims posed an obstacle to the congressional purpose
of uniformity.  <u>Chae</u>, 593 F.3d at 947, 950.  The court concluded
that the obstacle "must bow to the overriding principles of
conflict preemption and federal law supremacy."  <u>Id.</u>  In doing
so, the <u>Chae</u> court rejected (and distinguished) the law of the
Fourth Circuit.  <u>Id.</u> at 945-46.

In the Fourth Circuit, uniformity is not recognized as an
important federal objective of the Higher Education Act ("HEA")
for purposes of obstacle preemption.  <u>Coll. Loan</u>, 396 F.3d at
597 ("We are unable to confirm that the creation of
'uniformity,' a goal relied on by the district court in its
Preemption Ruling, was actually an important goal of the HEA.").
<u>Chae</u> rejected <u>College Loan</u> as not being the law of the Ninth

Circuit.  593 F.3d at 945-46 (9th Cir. 2010).  Chae also distinguished College Loan on two bases.  First, the court noted that College Loan was a dispute between lenders, not a borrower and a lender, and that the federal law was not primarily designed to regulate the lender-lender relationship.  Id. at 946.  Second, the court stated that the plaintiffs in College Loan were ultimately trying to enforce, not undermine, federal law.  Id.

Federal appellate courts have not followed Chae's lead with respect to obstacle preemption.  Although the Nelson court "assume[d]" that there was a substantial need for nationwide consistency with reference to the particular claims in Chae, it declined to apply Chae's "broad language on conflict preemption and the value of uniformity in the federal loan program" to a different set of claims.  928 F.3d at 651.

The court's analysis pointed out that the HEA's express preemption provisions counsel against a hasty finding of obstacle preemption:  "The number of those provisions and their specificity show that Congress considered preemption issues and made its decisions.  Courts should enforce those provisions, but we should not add to them on the theory that more sweeping preemption seems like a better policy."  Id. at 650 (emphasis added).  The court was loath to strike down state law in circumstances where "state law and federal law [could] exist in

24

harmony." Id. at 651. Among Nelson, Navient, and Lawson-Ross, Nelson was actually the least critical of Chae's obstacle preemption analysis.

Consistent with the Nelson court, the Lawson-Ross court stated, "When Congress has explicitly addressed preemption in a statute, an implication arises that it did not intend to preempt other areas of state law." 955 F.3d at 920. The court went on to explain that even without the express preemption of the HEA, the court would still not apply obstacle preemption. Id. at 921. The court specifically rejected the "premise" that that there existed a Congressional goal of "uniformity of communications between loan servicers and borrowers," calling it "mistaken." Id. And even assuming a uniformity purpose within the HEA, held the court, state law claims prohibiting "affirmative misrepresentations to borrowers—in contrast to [claims] imposing a duty to disclose—does no harm to standardization of disclosures for federal student loan programs." See id. at 923.

The Navient court agreed that the express preemption provisions of the HEA made the applicability of obstacle preemption less likely. 967 F.3d at 293. The court disagreed with Chae's holding regarding uniformity: "We are not persuaded by the Ninth Circuit's conclusion that uniformity was an intended purpose of the Education Act, and we join the other

Circuits that have rejected that idea." Id.  The court further explained that "[t]o infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive." Id.  There was little difficulty rejecting the obstacle preemption argument.

Here, binding authority holds, for purposes of obstacle preemption under the HEA, that uniformity does not qualify as an important federal goal.  Coll. Loan, 396 F.3d at 597.  Coast attempts to distinguish College Loan in the same way that the Ninth Circuit did in Chae.  Coast points out that College Loan involved a lender-lender dispute and argues that the nature of that conflict did not implicate a uniformity concern in the same way it does here.

The language quoted from College Loan in both Chae and Coast's argument is this:  "Importantly, neither the district court nor the parties have explained how these statutory purposes would be compromised by a lender, such as College Loan, pursuing breach of contract or tort claims against other lenders or servicers."  396 F.3d at 597 (emphasis added).  Coast changes "these" to "the" in the quote, but that slight change alters the meaning because "these statutory purposes" that our Court of Appeals was referring to expressly did not include uniformity.  Instead, "these statutory purposes" were those that the court

listed in the preceding sentence:  "encouraging states and non-profit organizations to make loans to students for post-secondary education, providing loans to those students who might not otherwise have access to funds, paying a portion of the interest accruing on student loans, and guaranteeing lenders against losses."  Id. at 597.  Accordingly, the "uniformity" line of argument is a dead end in this circuit.

Perhaps recognizing this, PFC and PRI point to slightly different federal interests:  "The policy at issue here is the federal government's express directive that it be protected against losses from defaulted borrowers and that those collecting on its behalf be shielded from multifarious state law liability."  (See ECF No. 29, at 10.)  The second part of the sentence is essentially saying the federal interest is uniformity, but in different words.  The first part carries more weight, but it too fails.  By making borrowers liable for collection costs, Congress suggested that it was not interested in subsidizing collection activity.  But it does not follow that Congress wanted to provide collection agencies with full immunity from consumer protection laws.  Had it wanted to do so, it could have expressly so provided.

Even without the binding precedent on this matter, defendants' obstacle preemption argument would fail.  In the area of obstacle preemption, citing overarching goals of federal

27

law and saying that state law hinders them is generally insufficient.  Judge Goodwin's opinion in <u>Smith v. BAC Home Loans Servicing</u> is instructive here.  769 F. Supp. 2d 1033 (S.D.W. Va. 2011).  In <u>Smith</u>, a bank argued that federal banking law preempted a consumer's claims under the WVCCPA (relating to the foreclosure of her home).  <u>Id.</u> at 1037.  The bank's position was that because the claims "directly implicated" how the bank serviced the loans, they were preempted.  <u>See id.</u> at 1045.

In rejecting the bank's argument, Judge Goodwin explained that "[o]bstacle preemption is not triggered merely because West Virginia's broad statute prohibiting unlawful forms of debt collection happens to ensnare certain practices of national banks."  <u>Id.</u> at 1046.  He further noted,

> In my view, forcing BAC to comply with the WVCCPA provisions identified in the Complaint will not stand as an obstacle to the significant regulatory objectives underlying the NBA and the relevant OCC regulations—allowing national banks and their operating subsidiaries to engage in mortgage servicing free from unduly burdensome state regulation.  It is not as if, by contrast, West Virginia has attempted to outlaw mortgage servicing as a whole or even sought to place any direct limits on the nature of that business.

<u>Id.</u>

A successful obstacle preemption argument generally identifies an important federal goal with precision.  For example, in <u>Geier v. American Honda Motor Co.</u>, the defendant successfully argued obstacle preemption by pointing to a very

specific provision of a regulation:  one concerning whether airbags were mandatory.  See 529 U.S. 861, 864-65 (2000).   The regulation made it mandatory for manufacturers to put airbags in new vehicles, but only ten percent of them.  Id. at 879.   The Court concluded that in limiting its mandate to only ten percent, the federal regulation "deliberately sought a gradual phase-in of passive restraints," to allow more time for research and development, as well as public acceptance, and to produce a "mix" of safety devices in cars traveling U.S. roads.  Id.   The regulation was also designed to make the adoption of state seatbelt laws more likely.  Id. at 881.  The regulation had a very extensive procedural history, which included a rejection of an all-airbag standard and reflected significant concern with public sentiment and public safety.  Id. at 878-89.

Beyond deriving from a very specific regulation, the federal interest itself in Geier was specific:  the maintenance of manufacturer choice in passive restraint systems to promote safety.  Id. at 886; Williamson v. Mazda Motor of Am., Inc., 562 U.S. 323, 330 (2011) ("In Geier, we found that the state law stood as an obstacle to the accomplishment of a significant federal regulatory objective, namely, the maintenance of manufacturer choice." (internal quotation marks omitted)).  The specificity of the federal interest there brought a concrete obstacle into focus.

The purported federal interests here are not specific and are not firmly rooted in the text of federal law.  And the purported conflict is not sharp.  Granted, plaintiff's claims may cause collection costs to go up and ultimately lead to higher financing costs, but a mere tension between state and federal law is not an obstacle conflict.  Defendants essentially ask this court to make a policy judgment that these claims are not a benefit to society.  To a certain extent, the obstacle preemption analysis requires the court to exercise policy judgment at the margins, where there is a specific federal interest and a sharp conflict that the court can presume Congress would disdain.  Here, however, while disallowing plaintiff's claims might make for good policy, it would make for bad law to do so on obstacle preemption grounds.  The court would essentially have to rewrite the preemptive scope of the HEA.

Lastly, the court must address defendants' argument that the ED's 2018 informal guidance supports its obstacle preemption argument.  See Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 FR 10619 (Mar. 12, 2018). But the court need not dwell on this argument long.  As Judge Friedman explained, this guidance is entitled to no Chevron

deference[9] and lacks any power to persuade under <u>Skidmore v.
Swift & Co.</u>, 323 U.S. 134 (1944).  <u>Student Loan</u>, 351 F. Supp. 3d
at 47-51, 70.

What is more, the ED itself recently reversed course,
calling the 2018 guidance "seriously flawed."  86 FR 44277.  In
revoking the 2018 interpretation, the ED stated as follows:

> In short, an approach that is marked by Federal-State
> cooperation is likely to secure better implementation
> of student aid programs as well as better service to
> borrowers and their families.  Out of this cooperation
> may come a broader understanding of how these mutual
> efforts can advance the central goal of facilitating
> affordable access to higher education for students in
> every part of the country.  For these reasons, the
> Department is issuing this interpretation with the
> explicit purpose of revoking and superseding the 2018
> interpretation.

86 FR 44277.

In light of the original lack of persuasiveness of the 2018
guidance and the subsequent revocation of that guidance, it does
not support defendants' preemption argument.

**c. Whether the FAC States a WVCCPA Claim**

Defendants argue that plaintiff's claim fails on the
merits—that is, the letter did not contain any "fraudulent,
deceptive or misleading representation" within the meaning
§ 46A-2-127.  They say that the letter accurately presented the
total amount of plaintiff's indebtedness under her loan terms as

---

[9] <u>See</u> <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467
U.S. 837 (1984).

of the date of the sending.  Upon default, they say, plaintiff immediately owed reasonable collection costs, so the letter accurately indicates that she owed "fees and costs" in an amount equal to the percentage of the total principal and interest that the lender had agreed to pay defendants.

Defendants frame plaintiff's contention as one merely that the contingency fee could have been less if she negotiated a resolution for less than the total amount due.  Defendants contend that, moreover, the disclaimer stating that the fees and costs were not due until the time of payment accurately described the situation.[10]  Further, defendants argue that accepting plaintiff's argument would lead to absurd results:  If the collection agency omitted the contingency fee from the total balance due, it would then need to separately pursue collection of the contingency fee based on the total resolution amount, in which case borrowers would likely consider the "balance" without the collection fee added to be misleading.  Defendants also say that their language concerning ED's indication that the "entire balance as indicated above is due and payable," which plaintiff contends is false, was not false within the meaning of the

---

[10] On the front of the letter, there is a small asterisk before the label "FEES & COSTS."  On the back of the letter, there is another asterisk with the following statement:  "This collection agency fee is not due until the time of payment and the amount of the fee may decrease at the time of payment depending on the amount that is ultimately paid."  (ECF No. 27-1.)

WVCCPA because the letter as a whole did not purport to be from the ED and because, moreover, the ED had approved the sending of the letter.

Plaintiff focuses on the nature of a contingency fee:  It is not earned (and thus not due) until the contingency is fulfilled, and the ultimate amount cannot be known until the collection agency's degree of success is known.  Plaintiff does not dispute that, had she paid her total principal and interest, she would immediately owe collection costs in the amount indicated in the letter.  She says that it was deceptive, however, for defendants to lead her to believe that the "FEES & COSTS" were unavoidable and already incurred.  Thus, according to plaintiff, it was a misrepresentation to list the amount of fees and costs due and payable immediately ("as of the date of this letter") as the maximum potential contingency fee that could materialize (if plaintiff paid in full) as of the date of the letter.  What is more, plaintiff says, defendants falsely suggested that the ED had calculated the amount and had deemed it presently due.

Plaintiff further argues that the asterisk statement did not clarify the misrepresentation.  She points out that the statement says the collection fee "may" decrease when, in reality, it would certainly decrease unless she paid in full. Together with language on the front of the page stating that the

total balance may go up, plaintiff says that the asterisk
explanation could easily lead a borrower to conclude that her
willingness to pay more could reduce the collection fee.

In the absence of sufficient state case law fleshing out
the issue of whether the allegations here state a claim, the
parties look to analogous cases decided under the Fair Debt
Collection Practices Act (FDCPA), a federal law which the
Supreme Court of West Virginia has described as "nearly
identical" to the WVCCPA.  See Fleet v. Webber Springs Owners
Ass'n, Inc., 772 S.E.2d 369, 379 (W. Va. 2015).  District courts
are split on whether allegations like those here state a claim.
The conflict in persuasive authority comes into focus by looking
at three analogous claims in the FDCPA context.

In Ossipova v. Pioneer Credit Recovery, Inc., Judge Woods
concluded that because the plaintiff's default triggered
liability for reasonable collection costs, the inclusion of a
reasonable collection fee—contingent or not—in the total balance
was not misleading:

> Pioneer indicated in their June 22, 2018 letter to
> Plaintiff after her default that her outstanding
> principal and interest totaled $78,968.86, and that
> the associated collection charge was 119,221.03 [sic]—
> exactly 24.34% of $78,968.86.  Given this, the Court
> finds it impossible to reconcile the conclusory
> allegations in Plaintiff's complaint that she did not
> owe the collection costs identified in Pioneer's
> letter at the time she received it with the provisions
> of the MPN, the HEA, and ED regulations—which are
> incorporated by reference into her complaint—and which

34

> together belie Plaintiff's allegations.  The agreed-
> upon terms of the MPN obligated Plaintiff to pay
> "reasonable collection fees and costs" that would
> become "immediately due and payable" upon her default
> and which would be governed by the HEA and applicable
> ED regulations.  As a result, the Court concludes that
> Pioneer's inclusion of the $19,221.03 collection
> charge in its June 22, 2018 letter was neither false,
> deceptive, or misleading, nor did it constitute the
> use of unfair or unconscionable means to collect or
> attempt to collect on a debt.

No. 1:18-EV-11015-GHW, 2019 WL 6792318, at *4-5 (S.D.N.Y. Dec.
11, 2019).

The facts in <u>Ossipova</u> were substantially similar to those
here, with two exceptions.  First, the letter clearly listed the
collection cost as a "Collection Charge," not as "FEES & COSTS,"
as here, with an asterisk that later suggests that this means a
collection cost.  <u>Id.</u> at *1-2.  Second, there does not appear to
have been a statement in the letter suggesting that the ED
calculated the amount due and payable to include the contingency
fee.  <u>See id.</u>

By contrast, in <u>Reizner v. Pioneer Credit Recovery, Inc.</u>,
Judge Linares concluded that similar allegations to those here
passed muster at the pleading stage:

> Considering that the collection charge was allegedly
> contingent on the collection of the debt, Plaintiff
> claims that the collection charge could not be
> calculated, nor could it be determined as reasonable,
> at the time Defendant sent its collection letter.
>
> When taking these allegations as true, which the Court
> must at this stage of the proceedings, and under the
> least sophisticated debtor standard, Plaintiff has

35

> sufficiently stated a FDCPA claim in order to survive
> dismissal based on the allegedly false or misleading
> inclusion of a contingent fee that had yet to be
> charged, incurred, or due.

No. CV 18-16014 (JLL), 2019 WL 1569824, at *3 (D.N.J. Apr. 11,
2019) (citation omitted).  The court determined that "[t]o
conclude otherwise would be inappropriate at this early stage of
the proceedings where the Court only considers the pleadings and
where the parties have not had the benefit of discovery."  Id.

Finally, in Francis v. General Revenue Corp., Judge Cogan
granted summary judgment to the plaintiff, holding that a
similarly worded letter was deceptive.  See No. 18-CV-6955
(BMC), 2020 WL 4586392, at *1 (E.D.N.Y. Aug. 10, 2020).  The
court noted the disagreement among other courts on this issue.
Ultimately, the court found that it was acceptable to list the
collection charges, but deceptive to hide the fact that they
were contingent:

> I do not consider a reasonable, contingent,
> percentage-based collection fee to be improper in and
> of itself given plaintiff's broad obligation to pay
> "all attorney's fees and other reasonable collection
> costs."  However, defendant's failure to disclose the
> contingent nature of the collection cost – instead
> representing the fee as an out-of-pocket expense that
> the creditor has already paid, or at least definitely
> will pay in the future – was deceptive.

Id. at *4 (citation omitted).

The court further stated,

> [T]he collection letter represents the collection fee
> as definite when it is not.  Defendant is entitled to

36

> $1,680.04 if and only if it successfully collects the
> entire balance.  If the collection letter explained
> that the collection fee was contingent on the
> collected amount, there would likely be no violation.
> But the lack of disclosure renders the collection
> letter deceptive to the least sophisticated consumer,
> who "could easily misinterpret the defendant's letter
> to mean that the plaintiff actually owed $1,680.04 in
> collection costs, when in fact she did not."

Id. (quoting Annunziato v. Collecto, Inc., 207 F. Supp. 3d 249, 261 (E.D.N.Y. 2016)).

Judge Woods's reasoning in Ossipova does carry some weight. Reasonable collection costs become due immediately upon default, they are calculated as a percentage of the principal and interest, and the lender is under no obligation to accept a reduced amount; thus, it is arguably not misleading to say that the contingency fee is presently due.

But Judge Cogan's reasoning is also persuasive:  It is inaccurate to suggest that a lender has already incurred or paid the collection fee or that it is otherwise non-contingent.  And the court is likewise persuaded by Judge Linares's decision to allow for a better-developed record before ruling on the merits. Moreover, the additional allegation here regarding the ED's indication of the amount presently due may distinguish this case from Ossipova.  Another additional issue in this case is the asterisk and accompanying note.  The note gestures toward explaining that the collection fee is contingent, but ultimately stops well short of doing so.

In her surreply,[11] plaintiff asks the court to make a "preliminary conclusion at the motion to dismiss stage:  that Defendants' collection letter falsely represented as immediately due a total balance not yet owed and falsely misrepresented that the Department of Education had authorized or approved of the amount demanded." (ECG No. 32-1, at 10.)  In denying the motions to dismiss, the court does note that its conclusion on the merits is indeed preliminary.[12]

### d. Coast's Argument Regarding Non-Involvement

Coast separately argues that because it did not send the letter, and because plaintiff has not alleged that Coast controlled the sender (PRI), plaintiff fails to state a claim as to Coast.  The court disagrees.

One of the essential elements of an agency relationship is the existence of some degree of control by the principal over

---

[11] The court **GRANTS** plaintiff's motion to file a surreply (ECF No. 32) because there is some merit to her argument that the reply briefs presented new material and because the surreply was helpful to the court.

[12] The court may also need to revisit the preemption issue. Under Judge Cogan's analysis, the failure to disclose the contingent nature of the collection fee was the crucial problem. Because that case was decided under federal law (the FDCPA), it did not implicate § 1098g.  Here, if the case boils down to a failure to disclose the contingent nature of the collection cost, it could turn out that the claim is preempted.  For now, the court assumes that the failure to disclose the contingent nature of the collection cost was fraudulent and that § 1098g does not preempt fraudulent omissions (see note 4, supra).

the conduct and activities of the agent.  Syl. Pt. 3, <u>Teter v.</u>

<u>Old Colony Co.</u>, 441 S.E.2d 728, 730 (W. Va. 1994).

> It is always incumbent upon one who asserts vicarious
> liability to make a prima facie showing of the
> existence of the relation of master and servant or
> principal and agent or employer and employee.
> However, once a prima facie showing has been made, it
> is incumbent upon one who would defeat liability on
> the basis of an independent contractor relationship to
> show such fact.

<u>Sanders v. Georgia-Pac. Corp.</u>, 225 S.E.2d 218, 222 (W. Va.

1976).

In West Virginia, whether the existence of an agency

relationship is a question of fact or law depends on whether the

facts are disputed:

> When the facts relied upon to establish the existence
> of an agency are undisputed, and conflicting
> inferences can not be drawn from such facts, the
> question of the existence of the agency is one of law
> for the court; but if the facts pertaining to the
> existence of an agency are conflicting, or conflicting
> inferences may be drawn from them, the question of the
> existence of the agency is one of fact for the jury.

<u>All Med, LLC. v. Randolph Eng'g Co.</u>, 723 S.E.2d 864, 870 (W. Va.

2012).

Here, the letter at issue plainly states that PRI was

acting on Coast's behalf in sending the letter.  The language is

quoted in the complaint and the letter is incorporated by

reference.  Accordingly, at this stage, and in light of the

other facts alleged, plaintiff is entitled to the reasonable

inference that PRI was acting as Coast's agent.  It is true that

39

the letter says PRI was acting as a subcontractor, but whether an agency relationship existed remains to be seen on a more developed record.

## IV.   Conclusion

For the reasons stated above, the court denied PFC and PRI's motion to dismiss (ECF No. 11) and Coast's motion to dismiss (ECF No. 13) in its order of September 30, 2021.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record.

**IT IS SO ORDERED** this 4th day of November, 2021.

ENTER:

David A. Faber
Senior United States District Judge